236 F.3d 468 (9th Cir. 2000)
 OKANOGAN HIGHLANDS ALLIANCE; WASHINGTON ENVIRONMENTAL COUNCIL; COLVILLE INDIAN ENVIRONMENTAL PROTECTION ALLIANCE; KETTLE RANGE CONSERVATION GROUP, Plaintiffs,
and
CONFEDERATED TRIBES OF THE COLVILLE RESERVATION, Plaintiff-intervenor Appellant,
v.
ROBERT WILLIAMS, Regional Forester; RICHARD A. FERRARO, Deputy Regional Forester; UNITED STATES FOREST SERVICE; SAM GEHR, Supervisor of the Okanogan National Forest, Defendants-Appellees,
and
BATTLE MOUNTAIN GOLD COMPANY, Defendant-intervenor-Appellee.
OKANOGAN HIGHLANDS ALLIANCE; WASHINGTON ENVIRONMENTAL COUNCIL; COLVILLE INDIAN ENVIRONMENTAL PROTECTION ALLIANCE; KETTLE RANGE CONSERVATION GROUP, Plaintiffs-Appellants,
and
CONFEDERATED TRIBES OF THE COLVILLE RESERVATION, Plaintiff-intervenor,
v.
ROBERT WILLIAMS, Regional Forester; RICHARD A. FERRARO, Deputy Regional Forester; UNITED STATES FOREST SERVICE; SAM GEHR, Supervisor of the Okanogan National Forest, Defendants-Appellees,
and
BATTLE MOUNTAIN GOLD COMPANY, Defendant-intervenor Appellee.
 Nos. 99-35537, 99-35538
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted November 13, 2000
Filed December 29, 2000
 
 [Copyrighted Material Omitted]
 Roger Flynn, Western Mining Action Project, Boulder, Colorado, for the plaintiffs-appellants.
 Stephen H. Suagee, Office of the Reservation Attorney, Nespelem, Washington, for the plaintiff-intervenor-appellant.
 Ethan G. Shenkman, Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.
 Michael J. Malmquist and Jim Butler, Parsons Behle & Latimer, Salt Lake City, Utah, for the defendant-intervenorappellee.
 Appeals from the United States District Court for the District of Oregon John Jelderks, Magistrate Judge, Presiding. D.C. No.CV-97-00806-JE D.C. No. CV-97-00806-MM
 Before: Cynthia Holcomb Hall, Pamela Ann Rymer, and Susan P. Graber, Circuit Judges.
 GRABER, Circuit Judge:
 
 
 1
 Plaintiffs Okanogan Highlands Alliance (OHA) and the Confederated Tribes of the Colville Reservation (Colville) challenge the adequacy of the Final Environmental Impact Statement (EIS) and Record of Decision (ROD) prepared by the United States Forest Service (Forest Service).[1] Plaintiffs make three arguments: (1) The district court and the Regional Forester considered documents that were not part of the administrative record, in violation of the Administrative Procedure Act (APA), 5 U.S.C. 551-706; (2) the EIS contains an inadequate discussion of necessary mitigation measures, in violation of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321-4370d, and the APA; and (3) the Forest Service failed to select the most environmentally preferable, but still profitable, project alternative that it considered, in violation of 16 U.S.C. 478 and 551 (the Organic Act). Colville also contends that the Forest Service violated the trust obligations that federal agencies owe to Native American tribes. We affirm the district court's ruling that the Forest Service did not violate NEPA, the APA, the Organic Act, or its trust obligations.
 
 FACTUAL AND PROCEDURAL HISTORY
 
 2
 In 1992, Battle Mountain Gold Company (BMG) submitted a proposed plan of operations to the Forest Service, the Bureau of Land Management (BLM), and the Washington Department of Natural Resources for the development, operation, and eventual closure of a gold mine in an area on and around Buckhorn Mountain in Washington. We will refer to this proposal as "the Project." BMG proposed to process about 3,000 tons of ore and handle an average of 34,000 tons of waste rock per day for eight years. BMG expected to remove about 180,000 ounces of gold per year. The project would "directly disturb" 787 acres of land, of which 59 percent (469 acres) is administered by the Forest Service, 24 percent (189 acres) is administered by the BLM, 2 percent (13 acres) is administered by the Washington Department of Natural Resources, and 15 percent (116 acres) is owned by private parties.
 
 
 3
 The Forest Service issued an EIS for the Project. The Forest Service discussed seven project alternatives in the EIS, including a "no-action" alternative. Relevant to this appeal are Alternatives B and C. In Alternative C, the Forest Service proposed that ore be extracted by underground methods only. The Forest Service determined that Alternative C was "the most environmentally preferable of the action alternatives."
 
 
 4
 Alternative B, a version of BMG's original submission, proposed to operate the mine 24 hours a day, seven days a week, for eight years, with an added year at the start for construction and another at the end for reclamation. The Forest Service expected the operation to produce a mine pit that would fill with water, creating a lake that would cover 40 acres and be up to 350 feet deep. The operation would remove about 105 million tons of rock, and gold would be extracted from the rock through a cyanide vat leach process. An average of 17,900 cubic yards of waste rock per day would be placed in two permanent waste-rock disposal areas.
 
 
 5
 The Forest Service, in its ROD, approved Alternative B. Alternative C was not selected "because of substantial impacts to mine economics, a reduction in mineral resource recovery, and because environmental effects associated with surface mining could be addressed fully or in part by reasonable reclamation, mitigation or compensatory requirements."
 
 
 6
 Colville and OHA appealed the selection to the Regional Forester, but the appeal was denied. OHA challenged the EIS and ROD in federal district court, pursuant to the APA, naming the Forest Service and its officials as defendants. Colville intervened as a plaintiff, and BMG intervened as a defendant. Plaintiffs and Defendants all filed motions for summary judgment.
 
 
 7
 The magistrate judge granted Defendants' motions.[2] The court made the following rulings that are relevant to this appeal: (1) the Forest Service's discussion of mitigating measures in the EIS conformed to NEPA and was neither arbitrary nor capricious; (2) the Forest Service's selection of Alternative B did not violate the Organic Act's requirement that the Forest Service's decisions should "minimize adverse environmental impacts"; and (3) the Forest Service did not violate the trust obligations that it owed to Colville. This timely appeal ensued.
 
 STANDARDS OF REVIEW
 
 8
 We review de novo the district court's determination, on summary judgment, that the EIS satisfied NEPA. City of Carmel-by-the-Sea v. United States Dep't of Transp. , 123 F.3d 1142, 1150 (9th Cir. 1997). In a challenge under the APA, we must determine whether the Forest Service's actions were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998) (challenging, under the APA, an EIS's discussion of mitigating measures); Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 573 (9th Cir. 1998) (challenging, under the APA, an agency's submission of a ROD as violating the trust responsibility owed to a Native American tribe).
 
 DISCUSSION
 A. The Administrative Record
 
 9
 Plaintiffs contend that the Regional Forester and the district court relied on documents that were not part of the administrative record in making their decisions upholding the validity of the EIS and ROD. In particular, Plaintiffs refer to an April 1997 economic analysis of Alternative C and a March 1997 stream-flow mitigation plan, both prepared by BMG and submitted to the Regional Forester as part of the appeal of the January 1997 ROD (collectively, the "post-ROD documents"). We have reviewed the decisions of the district court and the Regional Forester and hold that neither the district court nor the Regional Forester relied on any materials outside the administrative record in their decisions.
 
 
 10
 It is undisputed that BMG submitted post-ROD documents to the Regional Forester. A remand would be necessary, however, only if the agency's "journey outside the record worked substantial prejudice." Marathon Oil Co. v. EPA, 564 F.2d 1253, 1265 (9th Cir. 1977) (citation and internal quotation marks omitted). We need not decide whether "substantial prejudice" existed in this case, because the Regional Forester took no "journey outside the record" at all.
 
 
 11
 The Regional Forester stated in his decision that he had reviewed the record provided by the Forest Supervisor, "including his review of new information presented in the appeals." The Regional Forester then responded to each of the issues raised by the appealing parties, but did not base his conclusions that the EIS and ROD were adequate on the data found in either of the post-ROD documents. The Regional Forester did note merely that the 1997 mitigation plan exists. In his response to Plaintiffs' concern that the ROD was issued before a determination had been made that water-quality standards could be met, the Forester noted that the EIS requires the proponent "to submit a mitigation plan consistent with the permitting requirements to obtain a [National Pollutant Discharge Elimination System] permit. Interested party comments from BMG indicate that a detailed water rights mitigation plan has been submitted to [the Washington Department of Ecology]."
 
 
 12
 We do not believe that BMG's comment informing the Forester that it had taken steps to obtain a state permit, and the Forester's recognition of that fact, can be considered a "journey outside the record." The "appeal record," which consists of the documents "upon which review of an appeal is conducted," is to include written comments by interested parties. 36 C.F.R. 215.2. The Forester simply acknowledged BMG's written comment that a plan existed; he did not use the plan itself or the data therein as support for any of the EIS's or ROD's underlying conclusions.
 
 
 13
 Our review of the district court's decision also belies Plaintiffs' argument that the district court erred in relying on postROD documents. Plaintiffs are correct that judicial review of agency decisions is generally limited to review of the administrative record. Morongo Band, 161 F.3d at 573. In this case, the district court said: "In finding that the Forest Service provided an adequate discussion of mitigation measures . . . today's decision is based solely on the discussion of mitigation measures provided in the FEIS and ROD." The district court's analysis and conclusions concerning the other issues relevant to this appeal also contain no hint of reliance on the post-ROD documents.
 
 
 14
 We hold, then, that neither the Regional Forester nor the district court violated the APA by relying on post-ROD documents. We turn now to the questions whether the EIS or the ROD themselves violate NEPA, the Organic Act, or the trust obligations owed to the Tribes.[3]
 
 
 15
 B. Requirements for Discussing Mitigation in an EIS
 
 
 16
 NEPA requires federal agencies to prepare an EIS for each "major Federal action[ ] significantly affecting the quality of human environment." 42 U.S.C. 4332(2)(C). The requirement ensures that federal agencies are informed of environmental consequences before making decisions and that the information is available to the public. Inland Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996). "NEPA does not mandate particular substantive results, but instead imposes only procedural requirements." Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.3d 517, 523 (9th Cir. 1994). We review an EIS under a "rule of reason" to determine whether it contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. Carmel-by-the Sea, 123 F.3d at 1150. We must be satisfied that the agency took a "hard look" at the possible environmental consequences. Idaho Sporting Cong., 137 F.3d at 1149. We must not, however, substitute our judgment for that of the agency. Laguna Greenbelt, 42 F.3d at 523.
 
 
 17
 An EIS is not complete unless it contains "a reasonably complete discussion of possible mitigation measures. " Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 352 (1989). That requirement is implicit in NEPA's demand that an EIS must discuss " `any adverse environmental effects which cannot be avoided should the proposal be implemented.' " Id. at 351-52 (quoting NEPA, 42 U.S.C. 4332(C)(ii)); see also 40 C.F.R. 1502.16(h) (stating that an EIS must contain "[m]eans to mitigate adverse environmental impacts"). NEPA does not contain, however, "a substantive requirement that a complete mitigation plan be actually formulated and adopted." Methow Valley, 490 U.S. at 352. The requirement "would be inconsistent with NEPA's reliance on procedural mechanisms." Id. at 353.
 
 
 18
 A mitigation plan "need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." National Parks & Conservation Ass'n v. United States Dep't of Transp., 222 F.3d 677, 681 n.4 (9th Cir. 2000). We need only be satisfied that the agency took the requisite "hard look" at the possible mitigating measures; but, on the other hand, a "perfunctory description " is not adequate to satisfy NEPA's requirements. Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998). A "mere listing" of mitigating measures, without supporting analytical data, also is inadequate. Idaho Sporting Cong., 137 F.3d at 1151.
 
 
 19
 Plaintiffs argue that the EIS and ROD contain inadequate discussions of the measures necessary to mitigate the environmental consequences of the mine-pit lake, the water overflow from the lake, and the waste-rock dumps. Plaintiffs contend that, although the EIS does list potential mitigating measures, the EIS "fails to include supporting documentation as to the effectiveness, reliability, cost, and feasibility of the listed measures." Plaintiffs also argue that the Forest Service violated NEPA and the APA by "transferring its duties" to state permitting agencies.
 
 
 20
 1. Discussion of Mitigating Measures in this EIS
 
 
 21
 The EIS contains an extensive discussion of the potential effects of the Project on water quality, both in the mine-pit lake and in the ground water. The Forest Service conducted geochemical modeling by computer to predict (a) the quality of water that would accumulate in the pit and discharge from the lake and (b) the potential effects of the discharge. The EIS predicts that the "[w]ater that would fill and ultimately discharge from the open pit is predicted to exceed the Washington fresh water chronic criteria for cadmium, copper, lead, mercury, and selenium and the Washington State fresh water acute criteria for silver and selenium." The EIS also concludes: In light of the relatively low flow and short ground water flow path predicted (the pit acts as a ground water sink, except for the extreme northeast corner), seepage from the open pit is expected to have a low overall impact on ground water quality in the vicinity of the pit. Furthermore, due to the biased assumptions used in the pit water quality study, predicted pit lake pollutant concentrations may overestimate the concentrations that would be observed under field conditions.
 
 
 22
 EIS 4.6.3 at 4-49.
 
 
 23
 The EIS discusses monitoring measures that would be required in order to "quantify any measurable environmental impacts . . . . Impacts that result in violations of regulatory stipulations would require alterations of Crown Jewel Project operations or additional mitigation actions." Mitigation is discussed separately in section 2.12 of the EIS. The EIS uses a rating system "to determine the probable effectiveness in achieving the mitigation measures objectives." Each mitigation measure is rated "High" (achieves the desired results more than 90 percent of the time), "Moderate" (achieves the desired results between 75 and 90 percent of the time, or "logic dictates that it is more than 90% effective, but no documentation exists"), or "Low" (effectiveness is unknown or unverified, or estimated to be less than 75 percent). The EIS proposes that potential water discharge problems be mitigated in the following manner:
 
 
 24
 Any water discharged from the Crown Jewel Project site, including the mine pit or collection and infiltration ponds, must meet [Washington] water quality permit requirements and federal water quality standards. If water quality requirements are not met, appropriate water treatment would be required. Water treatment may include, but is not limited to:
 
 
 25
 Precipitation and settling using lime, sulfide, ferric ion, and/or flocculents; Filtration;
 
 
 26
 Ion exchange;
 
 
 27
 Reverse osmosis;
 
 
 28
 Electrodialysis;
 
 
 29
 Air stripping;
 
 
 30
 Biological precipitation; or,
 
 
 31
 Passive wetlands.
 
 
 32
 Water quality problems may also be addressed by diverting discharges to the tailings facility (during operations only), or special cap design and construc tion on waste rock disposal areas or tailings pond embankments.
 
 
 33
 If water quality problems develop, then several steps would be taken to achieve compliance. These are:
 
 
 34
 1. Review of environmental impacts with the pos sibility of additional or increased frequency of monitoring;
 
 
 35
 2. Implement an interim (emergency or long term) water management plan to stabilize the situa tion;
 
 
 36
 3. Develop a conceptual engineering design of water treatment system alternatives that would be available to remedy the situation and select the most appropriate design for more detailed engineering;
 
 
 37
 4. The Proponent would prepare a detailed engi neering design of the selected alternative; the agencies would review and revise, as appropri ate, the environmental protection performance security required from the Proponent;
 
 
 38
 5. Undertake appropriate permitting of the selected water treatment system (conduct NEPA/SEPA review as appropriate);
 
 
 39
 6. Construct the selected water treatment system;
 
 
 40
 7. Operate and maintain the water treatment sys tem to meet design goals;
 
 
 41
 8. Monitor the water treatment system for compli ance; and, 9. Achieve a demonstrated `clean closure' or main tain long term (permanent) treatment.
 
 
 42
 Goal: Protect ground and surface water quality in case of unacceptable water discharges.
 
 Effectiveness: High
 
 43
 EIS 2.12.5.2 at 2-115.
 
 
 44
 The EIS's discussion of the mitigating measures required for the mine-pit lake takes a similar form. The EIS notes that the water in the mine-pit lake "would be required to meet Washington State Aquatic Life Water Quality Standards and human health standards." The EIS then lists a nine-step process for BMG to follow in case the mine-pit's water quality exceeds the state criteria for protecting aquatic life or human health. For example, the EIS requires BMG to "prepare a conceptual engineering design of water treatment system alternatives that would be available to remedy the situation as prescribed by modeling." The EIS notes that any water treatment system implemented by BMG would be subject to agency review and revision and, possibly, to further NEPA review. The EIS gives those mitigating measures an effectiveness rating of "Moderate-High."
 
 
 45
 The EIS also contains a discussion of the possible environmental effects of, and the possible mitigating measures for, the waste-rock dumps. The EIS states that "[h]umidity cell tests and confirmation geochemical testing indicated that 5% to 15% of the total waste rock material mined under[Alternative B] would potentially generate acid and leach metals." Potential effects include the leaching of dissolved metals,radionuclides, and nitrate into ground water and increases in sediment loading to streams. A more extensive analysis of the effects of the waste rock, based on computer modeling, is found in section 3.3.3 of the EIS at 3-10 to 3-21. The EIS states that, "[i]f needed, an underdrain (french drain) system would be installed to intercept any spring and seep flow" from the leaching of waste-rock material. "During operations, all water draining from, or through, waste rock areas would be collected in sediment traps. Water collected in the ponds would be allowed to seep into the ground water system if quality is suitable." The EIS concludes that "short-term impacts to ground water quality from the waste rock disposal areas are not expected to be substantial." Long-term impacts "are expected to be somewhat less than during operations."
 
 
 46
 The EIS discusses, in a format like the one previously described, potential measures to mitigate the adverse effects of the waste-rock dumps:
 
 
 47
 The Proponent would be required to develop a waste rock management plan as part of Crown Jewel Proj ect permitting. This plan would address the potential for formation of acid generating "hot spots" and pre vention of acid rock drainage. The plan must be approved by the [Washington Department of Ecol ogy], [Washington Department of Natural Resources], BLM, and Forest Service prior to approval of the NPDES permit. The BLM and Forest Service would require this waste rock management plan prior to movement of waste rock as part of the Plans of Operations.
 
 
 48
 EIS 2.12.5 at 2-114.
 
 
 49
 The EIS explains that the waste-rock management plan must contain certain features, such as the procedures "that would be used to handle, isolate, encapsulate and/or blend waste rock that exhibits acid generating potential. " Those measures are given an effectiveness rating of "High."
 
 2. NEPA Analysis
 
 50
 a. Adequacy of the Discussion of Mitigating Measures
 
 
 51
 The trial court did not err in ruling that, under the applicable standard of review, the EIS contains a reasonable discussion of mitigation. The EIS contains a thorough discussion of the potential adverse environmental effects of the Project. The Forest Service took the requisite "hard look " at those potential problems and required BMG to monitor the actual effects of the Project throughout its life. The EIS provides methods for ensuring that environmental problems do not develop. For example, if there is a decrease in water quality, the EIS provides procedures for ensuring compliance with applicable water-quality standards. The procedures are in "bullet" form and are stated in somewhat general terms, but this format is not deficient in the circumstances: The exact environmental problems that will have to be mitigated are not yet known because the Project does not exist. The EIS also requires BMG to post a security deposit to ensure compliance with environmental standards.
 
 
 52
 We realize that the line between an EIS that contains an adequate discussion of mitigation measures and one that contains a "mere listing" is not well defined. In Cuddy Mountain, the EIS for a proposed sale of timber contained the following discussion of mitigation measures: "[S]mall increases in sedimentation . . . would be mitigated by improvements in fish habitat in other drainages . . . . Offsetting mitigation would include such projects as riparian enclosures (fences around riparian areas to keep cattle out) and fish passage restoration (removing fish passage blockages). These activities can be effective but cannot be quantified with present data." 137 F.3d at 1380. We held that the Forest Service's "perfunctory description" of the mitigating measures was inadequate. Id.
 
 
 53
 By contrast, in Methow Valley, the Supreme Court analyzed the adequacy of an EIS that examined the environmental impact of a proposed ski resort on National Forest land. The EIS stated that the proposed project would not have a measurable effect on existing air quality, but that the off-site development of private land would have a significant effect on air quality. The EIS then identified potential actions that could be taken by the county governments to mitigate those adverse impacts, including the development of an air-quality management plan. The circuit court held that the EIS was inadequate because the effectiveness of the mitigation measures had not been assessed, and the measures themselves had yet to be developed. Methow Valley, 490 U.S. at 347. The Supreme Court reversed. Id. at 353.
 
 
 54
 The Supreme Court noted that an EIS without a "reasonably complete discussion of possible mitigation measures would undermine the `action-forcing' function of NEPA." Id. at 352. "There is a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." Id. The Court concluded that, because the EIS predicted that the on-site environmental impacts would be minimal, the proposed measures "cannot be deemed overly vague or underdeveloped." Id. at 358.
 
 
 55
 The difference between the discussion of proposed mitigation measures in Methow Valley and that in Cuddy Mountain appears to be one of degree. In Cuddy Mountain , this court read the EIS as suggesting that "the Forest Service did not even consider mitigating measures for the creeks actually affected by the sale." 137 F.3d at 1381 (emphasis added). By contrast, the EIS in the present case suggests that the Forest Service did consider and take a "hard look" at the environmental effects and mitigating measures. The EIS predicts that the environmental effects from the mine on ground water will be minimal, but extensive monitoring will be required nonetheless. The EIS then proposes several ways to prevent overflow from the mine-pit lake from affecting water quality. If those measures are unsuccessful, the EIS then provides a process for achieving compliance with water-quality standards. Similar processes are described for achieving compliance with water-quality standards in the mine-pit lake itself and in the waste-rock dumps. Each mitigating process was evaluated separately and given an effectiveness rating.
 
 
 56
 It is true that the mitigating measures are described in general terms and rely on general processes, not on specific substantive requirements. In the Forest Service's responses to comments from the Environmental Protection Agency on the draft EIS, the Forest Service explained that,
 
 
 57
 [s]ince it is not possible to predict exactly what water quality will be, it is difficult to predict what exact mitigation will be necessary. We have set up . . . a procedure to determine specific mitigation or treatment, if any, is required. Moreover, a perfor mance security which assumes treatment of the pit discharge water is necessary, will be collected prior to development.
 
 
 58
 Because the actual adverse effects are uncertain, and the EIS considered extensively the potential effects and mitigation processes, we conclude that the present case is closer to Methow Valley. Accordingly, we hold that the discussion of mitigating measures in the EIS is adequate.
 
 
 59
 b. Alleged "Delegation" to State Agencies
 
 
 60
 Next, Plaintiffs argue that the Forest Service "deferred" to state agencies its responsibility for reviewing mitigation measures. The record and our case law answer that argument.
 
 
 61
 The EIS's sections on mitigating measures do refer, as a mere statement of fact, to state permitting agencies and requirements. See, e.g., EIS 2.12.13.5 at 2-124 ("Water in the pit lake . . . would be required to meet Washington State Aquatic Life Water Quality Standards . . . ."). However, those sections go on to consider and discuss mitigation responsibilities directly and at length. See, e.g., id. ("The Proponent would prepare a detailed engineering design of the preferred alternative . . . .").
 
 
 62
 The fact that the EIS acknowledges that the project will be forced to comply with pollution permitting requirements is not, by itself, arbitrary or capricious. Cf. City & County of San Francisco v. United States, 615 F.2d 498, 501 (9th Cir. 1980) (noting that the Navy's decision not to prepare an EIS was reasonable when the "Candidate EIS" noted that the lessee "would be required to conform to all applicable pollution control laws and regulations as a condition of tenancy"). Such an acknowledgment does not, without more, shift the Forest Service's responsibility to state agencies.
 
 C. The Organic Act
 
 63
 Plaintiffs next argue that the Forest Service violated its duty to "prevent destruction of the National Forest System Lands and to minimize adverse environmental impacts, " as required by the Organic Act, 16 U.S.C. 478 and 551, and 36 C.F.R. 228.1. Plaintiffs contend that the Organic Act and 36 C.F.R. 228.1 required the Forest Service to select Alternative C, the most environmentally preferable, but still profitable, project alternative. We disagree.
 
 
 64
 Title 16 U.S.C. 551 authorizes the Secretary of Agriculture to promulgate regulations "to preserve the [national] forests thereon from destruction." One such regulation is 36 C.F.R. 228.1, which provides in part:
 
 
 65
 It is the purpose of these regulations to set forth rules and procedures through which use of the sur face of National Forest System lands in connection with operations authorized by the United States min ing laws, which confer a statutory right to enter upon the public lands to search for minerals, shall be con ducted so as to minimize adverse environmental impacts on National Forest System surface resources.
 
 
 66
 (Emphasis added; citation omitted.) Title 16 U.S.C.S 478 instructs, however, that 551 shall not be construed to "prohibit any person from entering upon such national forests forall proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof."
 
 
 67
 This circuit recognizes that 16 U.S.C. 478 and 551 together evidence the "important and competing interests" of preserving forests and protecting mining rights. United States v. Weiss, 642 F.2d 296, 299 (9th Cir. 1981). In Weiss, this court analyzed 16 U.S.C. 478 and 551 and noted that they refer to two interests (mining and environmental protection) that "were intended to and can coexist. " Id. Thus, those two statutory provisions allow the Forest Service to "adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment of placer claims for mining purposes." Id. (emphasis added); see also United States v. Shumway, 199 F.3d 1093, 1106-07 (9th Cir. 1999) (noting that, under Weiss, "the Forest Service may regulate use of National Forest lands by holders of unpatented mining claims . . . but only to the extent that the regulations are `reasonable' and do not impermissibly encroach on legitimate uses incident to mining and mill site claims"). The statutory text, therefore, does not support Plaintiffs' assertion that, when the Forest Service is forced to choose between project alternatives, environmental interests always trump mining interests.
 
 
 68
 Neither does 36 C.F.R. 228.1 require the result that Plaintiffs seek. To be sure, the regulation states that the purpose of the "rules and procedures" promulgated to govern mining operations in National Forest lands is to ensure that mining operations "minimize adverse environmental impacts." The regulation, however, sets no substantive standards that Defendants could violate. Rather, it merely explains the purpose of the remaining regulations, which do set substantive standards. And Plaintiffs do not claim that Defendants have violated any of those substantive standards.
 
 
 69
 For those reasons, we hold that the Forest Service's selection of Alternative B did not violate the Organic Act or 36 C.F.R. 228.1.[4]
 
 D. Reserved Indian Rights
 1. Background
 
 70
 The Colville Reservation was established in 1872. It consists of 2.9 million acres between the Columbia and Okanogan Rivers, bounded on the north by the Canadian border. In 1891 the Colville Indians entered into an "Agreement" with the United States, in which the Tribes ceded to the government roughly 1.5 million acres (collectively,"the NorthHalf"), but reserved the right to hunt and fish on the ceded land. The Agreement states that " `the right to hunt and fish in common with all other persons on lands not allotted to said Indians shall not be taken away or in anywise abridged.' " Antoine v. Washington, 420 U.S. 194, 196 n.4 (1975).
 
 
 71
 The Project lies within the North Half; approximately 2,000 acres of hunting and fishing territory will not be available to Colville members over the life of the Project. The Forest Service concluded that the Project will not "affect[Colville's] reserved rights to hunt and fish on the North Half. " The district court ruled that this determination was "based on a reasoned evaluation . . . such that its decision can be considered neither arbitrary nor capricious."2. Discussion
 
 
 72
 Federal agencies owe a fiduciary responsibility to Native American tribes. Morongo Band, 161 F.3d at 574; see also Klamath Water Users Protective Ass'n v. Patterson , 204 F.3d 1206, 1213 (9th Cir. 2000) (stating that "the United States, as a trustee for the Tribes, has a responsibility to protect their rights and resources"). In the absence of a specific duty, this responsibility is discharged by "the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." Morongo Band, 161 F.3d at 574.
 
 
 73
 Significantly, Colville's arguments are procedural in nature. Colville does not argue that any of the substantive rights guaranteed in the Agreement have been violated but, rather, that the EIS and ROD include only "passing references" to Colville's reserved rights. Colville argues specifically that the Forest Service failed to give adequate consideration to Colville's reserved hunting and fishing rights in five ways: (1) by failing to include in the EIS or the ROD a discussion of the effect of the Project on culture and subsistence, a feature of Colville's reserved rights; (2) by under calculating the tribal deer harvest; (3) by failing to include an adequate discussion of the effect of the Project on water quality, and, instead, deferring those issues to the state; (4) by failing to include an adequate discussion of mitigating measures; and (5) by failing to select Alternative C. Colville's challenge is, in essence, a challenge to the adequacy of the EIS, and the normal APA standard of review applies. See Morongo Band, 161 F.3d at 573-74 (examining whether the FAA's decision under NEPA violated its trust responsibility owed to a Tribe by applying the "arbitrary and capricious" standard of review).
 
 
 74
 We already have considered arguments 3, 4, and 5 in earlier sections of this opinion. We turn, then, to a consideration of the first and second arguments.
 
 
 75
 In response to the first argument, we conclude that the discussion of Colville's reserved rights is sufficient. The EIS and ROD contain numerous acknowledgments of Colville's rights. See, e.g., EIS 4.27.7 at 4-251 (including Colville's reserved hunting and fishing rights, and tribal cultural properties, as environmental issues that were considered and addressed); EIS 1.9.3 at 1-11 (recognizing Colville as "distinct, separate, political entities that have a unique legal relationship with Federal agencies," and noting that their reserved rights are addressed); EIS 1.10.2 at 1-12 (stating that a key issue addressed in the EIS is the Project's "potential to affect cultural resources, reserved rights, trust issues, and responsibilities"); EIS 3.9.1 at 3-69 to 3-70 (noting that the water resources in the Project area "may be necessary to satisfy the Tribe's federally reserved water rights"); EISS 3.13.3 at 3-93 (acknowledging Colville's hunting rights in the North Half).
 
 
 76
 The Forest Service examined the issues that will affect Colville's reserved rights and concluded that the Project will have no significant effects on hunting and fishing resources in the North Half. The ROD states:
 
 
 77
 Approximately 2000 acres of hunting and fishing territory will not be available to Tribal members over the life of the project. This is less than 1% of the total acreage of Federal lands available for Tribal hunting within the North Half. The small streams within the project area do not support fish popula tions. Project effects to the harvest of wildlife and fish by tribal members is not quantifiable; rather the effects to wildlife and fish habitat and stream flows has been disclosed in the FEIS (see Sections 4.11 Aquatic Habitat and Populations; and 4.12 Wildlife).
 
 
 78
 ROD at 20-21.
 
 
 79
 Section 3.12 of the EIS analyzes extensively the aquatic habitat in the Project area. Section 4.11 contains an extensive discussion of the potential effect of the Project on aquatic habitats. The Forest Service concluded that there would be no adverse effect on fish resources from the use of cyanide or from waste-rock disposal, but that there might be a short-term impact from an increase in turbidity and suspended sediments.
 
 
 80
 Section 3.13 of the EIS analyzes the wildlife habitat in the Project area. Section 4.12 discusses the potential adverse effects of the Project on wildlife. The Forest Service concluded that the selected alternative "will result in both shortterm and long-term effects to wildlife . . . . While some impacts will be permanent (e.g. much of the pit excavation), others will be reversible through reclamation." In Appendix H of the EIS, the Forest Service admitted that deer population data are incomplete. However, "[e]ven in the event that deer numbers are reduced in the [Project] area, the reduction would be relatively minor in comparison to the total deer population in the Analysis Area." Any potential reductions would be mitigated by road closures and, in fact, deer population might increase "since no hunting and firearms will be permitted within the mine area and undisturbed areas of suitable habitat would remain within the fenced mine perimeter." Id. Moreover, more than 600 acres of land would be acquired from private sources.
 
 
 81
 The EIS and ROD state repeatedly that Colville's reserved rights must be considered. The EIS extensively analyzes the issues that would affect those reserved rights and concludes that the impact would not be significant. We hold, then, that the Forest Service took the requisite "hard look" at the issues that will affect Colville's reserved rights.
 
 
 82
 Finally, in its second argument, Colville points to an error in EIS 3.15.4, in which the Forest Service estimated that Colville members harvested 28 deer in an area that includes the Project area. The Forest Service issued a corrected statement that increased the estimate to 219. That correction does not render the Forest Service's actions arbitrary or capricious. The decision that Colville's reserved rights would not be substantially affected by the Project was based on the mitigating measures (which are expected to increase deer habitat), and on a comparison of the amount of habitat affected to the total habitat. In other words, the decision did not depend on the number of deer harvested. Accordingly, we affirm the district court's ruling on this issue.
 
 
 83
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Final Envtl. Impact Statement, Crown Jewel Mine (U.S.D.A. Forest Serv. Jan. 1997); Record of Decision for the Final Envtl. Impact Statement, Crown Jewel Mine (U.S.D.A. Forest Serv. Jan. 1997).
 
 
 [2]
 The parties consented, in writing, to having the case heard by a magistrate judge.
 
 
 [3]
 In our analysis, we also will refrain from relying on post-ROD documents.
 
 
 [4]
 Plaintiffs argue, in their reply brief, that the Forest Service violated the Organic Act by failing to promulgate regulations that establish criteria for choosing between project alternatives. We do not address this argument, because it was raised for the first time in Plaintiffs' reply brief. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1413-14 n.6 (9th Cir. 1990).