**NORTHERN ALASKA ENVIRONMENTAL CENTER, et al., Plaintiffs,**

v.

**Gale NORTON, et al., Defendants.**

**No. J04–0006 CV(JKS).**

United States District Court, D. Alaska.

Jan. 10, 2005.

*ORDER*

SINGLETON, District Judge.

### INTRODUCTION

Plaintiffs challenge the decision by the Secretary of the Interior to make available for oil and gas leasing the entire Northwest Petroleum Reserve–Alaska ("Reserve"), rather than limiting leasing to a smaller area that would, in Plaintiffs' view, more adequately protect threatened environmental features of the Reserve. Spe-

cifically, Plaintiffs criticize the process leading to this result and challenge the Environmental Impact Statement ("EIS") and supporting Biological Opinion ("BiOp") upon which the decision rests. Plaintiffs request that this Court enter declaratory judgment asserting two points. First, that Defendants arbitrarily violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f[sic], and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, by authorizing leasing in the Northwest Planning Area of the National Petroleum Reserve–Alaska without a proper evaluation of the costs and benefits. Second, that the BiOp arbitrarily violates the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, and APA. Docket Nos. 66(Br.); 68 (Resp.Br.); 71 (Reply Br.). Plaintiffs allege that Defendants' NEPA analysis, specifically the Integrated Activity Plan/Environmental Impact Statement ("IAP/EIS"), (1) failed to consider all reasonable alternatives, specifically one protecting ecologically sensitive areas while still allowing leasing in high petroleum potential areas; (2) provided only a general programmatic EIS rather than a site specific analysis; (3) failed to analyze mitigation measures in the EIS; and (4) failed to consider reasonably foreseeable actions in the cumulative analysis. *See* Docket No. 66 at 12–40. Plaintiffs allege that Defendants failed to satisfy the ESA because the BiOp (1) fails to assess the entire agency action identified in the Record of Decision ("ROD"), and (2) ignores the uneven distribution of Steller's eiders and spectacled eiders. *See* Docket No. 66 at 40–50.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1923 President Warren G. Harding established the Naval Petroleum Reserve Number 4, which is now referred to as the NPR–A. IAP/EIS Vol. 1 at I–7. His motive was to provide an oil reserve for future use in national defense. In creating the reserve, President Harding noted that "the future supply of oil for the Navy is at all times a matter of national concern." *Id.* However, the Organization of Petroleum Exporting Countries ("OPEC") oil embargo during the 1970s established that the Nation had a need for oil that exceeded the needs of the Navy. *Id.* In response, President Gerald Ford created the National Petroleum Reserve Protection Act ("NPRPA"), which transferred authority from the Navy to the Secretary of the Interior and renamed the area the NPR–A. *Id.* The NPRPA prohibited petroleum exploration until the 1980 Congressional act directed the Secretary to undertake an "expeditious program of competitive leasing of oil and gas." *Id.; see also* 42 U.S.C. § 6508.

The NPRPA limits oil petroleum exploration in areas "designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value ...." 42 U.S.C. § 6504(b). Thus Congress has recognized the Reserve as a potential source for oil and gas exploration and production while simultaneously assuring that environmental concerns would not be overlooked.

The portion of the NPR–A in controversy here is 8.8 million acres of the Northwest Planning Area ("NWPA"). IAP/EIS Vol. 1 at I–3. Sensitive to the concerns to provide for necessary exploration while at the same time providing adequate protection, the Secretary established three special areas, two of which are within the NWPA. IAP/EIS Vol. 1 at I–7. The Teshekpuk Lake Special Area, in the northeast corner of the NWPA, protects migratory waterfowl and shorebirds, and the Colville River Special Area, in the southernmost area of the NWPA, protects the endangered peregrine falcon. *Id.* Vol. 1 at I–8.

The leases issued by the Bureau of Land Management ("the BLM") in 1982 and 1983 have now expired. *Id.* Vol. 1 at I–4. Therefore, the BLM initiated this NEPA review to undertake a renewed leasing program because the information upon which the earlier leasing had been authorized is now stale. *Id.*

Plaintiffs argue that Defendants acted arbitrarily in violation of NEPA and the APA by authorizing leasing in the entire NWPA without considering reasonable alternatives and without doing a site-specific analysis of each of the areas affected by its proposed action. Plaintiffs further argue that the BiOp is arbitrary in violation of the ESA and APA because it is insufficiently thorough, is not co-extensive with the ROD, and pays insufficient attention to the uneven distribution of eiders within the affected area. This Court has jurisdiction. 28 U.S.C. § 1331; 5 U.S.C. § 702.

## DISCUSSION

### I. Adequacy of NEPA Review

■ A district court's review of an EIS under NEPA is governed by the APA. *See* 5 U.S.C. § 706. A court may hold unlawful and set aside agency action, findings, and conclusions that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Lathan v. Brinegar*, 506 F.2d 677, 692–93 (9th Cir.1974). An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), or if the agency's decision is contrary to the governing law. 5 U.S.C. § 706(2)(A); *Lands Council v.*

*Powell,* 379 F.3d 738, 743 (9th Cir.2004). While the preparation of an EIS calls for judgment by the agency, courts require full compliance with the procedural requirements of NEPA. *See Save Lake Washington v. Frank,* 641 F.2d 1330, 1334 (9th Cir.1981).

Plaintiffs allege that Defendants' NEPA analysis, specifically the IAP/EIS, failed to consider all reasonable alternatives, particularly an alternative that would open for leasing those areas most likely to contain oil or gas in commercial quantities but that would protect ecologically sensitive areas by excluding them from leasing. Plaintiffs further argue that the IAP/EIS provided only a general programmatic EIS rather than a site specific analysis of the various expected leaseholds, failed to adequately analyze mitigation measures in the EIS, and failed to consider reasonably foreseeable actions in the cumulative analysis. *See* Docket No. 66 at 12–40.

### A. Reasonable Alternatives

#### 1. The Middle Ground

Plaintiffs argue that the BLM violated NEPA because the IAP/EIS essentially set out alternatives that either opened the entire reserve to leasing, or closed those parts of the reserve likely to contain oil and gas to leasing and thereby failed to consider a middle ground alternative. Docket No. 66 at 14. The middle ground, Plaintiffs assert, would allow some petroleum exploration and development of areas the agency considered most promising, while protecting specific sites that Plaintiffs consider ecologically sensitive. *Id.* Plaintiffs concede that five alternatives were considered, but state that those five alternatives covered both ends of the alternative spectrum from development to preservation, yet failed to provide any middle ground. *Id.* Alternative A opened 100%, Alternative B opened 96%, and Alternative

C opened 47% of the NWPA to oil and gas leasing, exploration, and possible development. IAP/EIS Vol. 1 at II–32, IV–69. However, Alternative C only opened 2% of the recognized high petroleum potential areas and, in Plaintiff's view "is essentially equivalent to the No Action Alternative." *Id.* Vol. 1 at IV–69. The No Action Alternative did not offer any oil and gas leases. *Id.* Vol. 1 at IV–69. And finally, the Preferred Alternative "is similar to Alternative B" opening 96% of the NWPA to oil and gas leasing, exploration, and possible development, including all recognized high petroleum potential areas. *Id.* Vol. 1 at IV–69. Plaintiffs argue that these alternatives ignore the ability to make available more than 2% but less than 100% of the high petroleum potential areas for leasing. Docket No. 66 at 14. Plaintiffs further note that the BLM was alerted to this problem by the Environmental Protection Agency ("EPA"), which commented that the alternative range lacked a compromise between the "all or nothing" options. Docket No. 66 at 15; Ex. 11 at 5. The EPA suggested that the BLM adopt an alternative that strikes a balance between protection of the natural and cultural resources, and production and development of petroleum. Docket No. 66, Ex. 11 at 5. The United States Fish and Wildlife Service ("FWS") also commented that the EIS offered little difference between the alternatives, specifically Alternatives A and B. *Id.*, Ex. 13 at 7.

Defendants respond that the five alternatives covered an acceptably broad range of alternatives given the policy objectives to be served by the project. Docket No. 68 at 27–31. Defendants assert that both Alternative C and the Preferred Alternative are middle ground alternatives, thus satisfying the NEPA requirements to consider a broad range of possible alternatives. *Id.* at 29–31. First, Defendants explain that Alternative C opens less than 2% of the high petroleum potential areas

because the areas of highest potential for oil and gas development overlap with the most biologically sensitive areas. *Id.* at 29 (citing IAP/EIS Vol. 3 at Maps 35, 49, 50, 54, 84, & 90). Defendants further note that under Alternative C nearly half of the NWPA would remain open to petroleum development, which may also have high development potential given additional information and exploration. *Id.* at 30 n. 25. Second, Defendants argue that while the Preferred Alternative opens 96% of the available land to petroleum development, it is in fact a middle ground alternative. *Id.* at 30. Defendants rely on the promise that the BLM will either defer development of the land for ten years or limit leases to no permanent surface occupancy for thirty-three percent of the NWPA. *Id.* at 30–31; IAP/EIS Vol. 1 at II–12. This level of protection, Defendants argue, makes the Preferred Alternative a middle ground alternative.

 The question presented is whether or not the BLM is required to include among the alternatives one that protects more areas considered environmentally sensitive while simultaneously allowing for more leasing than are provided in the most restrictive alternatives, and if so, whether the BLM did so in this case. NEPA mandates that the BLM provide a detailed statement regarding the alternatives to an agency's proposed action. *See* 42 U.S.C. § 4332(2)(C)(iii). Consideration of all reasonable alternatives to the agency action is "the heart of the environmental impact statement." *See* 40 C.F.R. § 1502.14 (2004); *see also Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir.1995). NEPA's alternatives requirement is necessary to ensure that the agency has before it and "takes into proper account all possible approaches to a particular project (including total abandonment of the project) which

would alter the environmental impact and the cost-benefit analysis. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n,* 449 F.2d 1109, 1114 (D.C.Cir.1971). "The discussion of alternatives in an E.I.S. statement is subject to a construction of reasonableness." *Lange v. Brinegar,* 625 F.2d 812, 818 (9th Cir. 1980). An EIS is rendered inadequate by the existence of a viable, but unexamined alternative. *Citizens For A Better Henderson v. Hodel,* 768 F.2d 1051, 1057 (9th Cir.1985); *see also Roosevelt Campobello Int'l Park Comm'n v. United States E.P.A.,* 684 F.2d 1041, 1047 (1st Cir.1982) (noting that an agency must "study all alternatives that appear reasonable and appropriate for study at the time of drafting the EIS, as well as significant alternatives suggested by other agencies or the public during the comment period" (internal quotations omitted)).

■ However, "an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. Bureau of Land Mgmt.,* 914 F.2d 1174, 1181 (9th Cir.1990). An agency does not need to analyze alternatives that are not significantly distinguishable from alternatives actually considered, or that have substantially similar consequences. *See N. Plains Res. Council v. Lujan,* 874 F.2d 661, 666 (9th Cir.1989). "Nor must an agency consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters,* 914 F.2d at 1180–81 (citing *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982) (stating that agencies need not consider alternatives unresponsive to policy objectives of management plan)); *Kilroy v. Ruckelshaus,* 738 F.2d 1448, 1454 (9th Cir.1984) (recognizing

that agencies need not consider alternatives that are "remote from reality" (quoting *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 837 (D.C.Cir. 1972))). While the BLM is not required to analyze speculative alternatives, it is required to "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

■ The purpose of the IAP/EIS, according to the BLM is to "determine the appropriate multiple-use management of this 8.8 million-acre area consistent with existing statutory direction.... [which] encourages oil and gas leasing in NPR–A while requiring protection of important surface resources and uses." IAP/EIS Vol. 1 at I–3. Given this purpose and factual scenario, a "hard look" should require the BLM to analyze more than "all or nothing" alternatives. To achieve its purpose, it is important that the BLM consider alternatives that balance petroleum production and resource protection. If the alternatives evaluated provide the necessary hard look at a balance between total preservation and total development, the agency has satisfied NEPA.

Defendants argue that Alternative C satisfies the requirements of NEPA because it aggressively protected sensitive biological grounds, while leaving nearly half of the NWPA open for petroleum production. However, the land left open for petroleum production contains less than 2% of high petroleum potential land. The BLM recognized in the EIS that this alternative "is essentially equivalent to the No Action Alternative." IAP/EIS Vol. 1 at IV–68. The BLM further concluded in the EIS that Alternative C "does not project any oil and gas development ...." *Id.* at IV–345. It is troublesome that both EPA and FWS commented on the lack of an alternative in the EIS that would focus on the areas most likely to produce oil

and gas while at the same time setting aside tracts identified as environmentally sensitive for preservation. Arguably, a true middle ground alternative would encompass actions that set aside specific tracts for environmental protection while identifying different tracts for development, i.e. those already identified as the high petroleum potential areas. Instead, Alternative C in effect exclusively protects the environment rather than promoting development, while the other alternatives arguably provide for development without protecting the environment. However, alternatives are not to be tested in isolation.

The BLM also counters that the Preferred Alternative is a middle ground alternative because, (1) leasing will be deferred for ten years in 17% of the NWPA, and (2) "no permanent surface occupancy restrictions" apply in 16% of the NWPA. Docket No. 68 at 30–31; see IAP/EIS Vol. 1 at II–12. Thus, the BLM contends that a total of 33% of the NWPA would be initially off limits to the permanent effects of petroleum development. Docket No. 68 at 30–31. The Preferred Alternative allows 96% of the NWPA to eventually be available for development, including all of the high potential petroleum production areas. IAP/EIS Vol. 1 at IV–69. Delaying potential development is only significant if the delay and contemplated further study during the period of the delay will adequately addresses environmental concerns within the region where development is delayed and the alternative adequately address environmental concerns within the area where development is not delayed.

On balance, the Court is not convinced that the BLM failed to analyze alternatives that weigh the risks to the environment within the NWPA against the benefit of development of high petroleum potential lands. In other words, the EIS satisfies the "touchstone" of a NEPA inquiry, which "fosters informed decision-making and informed public participation." See Block, 690 F.2d. at 767. It is important to note that the case law does not suggest that the BLM should select any specific alternative, only that it must consider a proper balance of alternatives in order to comply with NEPA procedures. See Lands Council, 379 F.3d at 743–44 ("NEPA imposes procedural requirements, but not substantive outcomes, on agency action.") (citing Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). The Court is satisfied that the agency considered and examined all viable alternatives. See Citizens for a Better Henderson, 768 F.2d at 1057 ("existence of a viable but unexamined alternative renders an environmental impact statement inadequate."). The Court's reasoning for finding the alternatives actually evaluated adequate for purposes of the statute will be expanded upon as the Audubon Alternative advocated by Plaintiff is explored below.

2. Explanation for not Considering the Audubon Alternative

Plaintiffs argue that Defendants failed to provide sufficient justification for not considering the Audubon Alternative. Docket No. 66 at 18. The Audubon Society submitted a "Wildlife Habitat Alternative" to the BLM as a potential middle ground alternative. Id. at 15; see Docket No. 66, Ex. 10. This alternative proposed adding four new Special Areas, which, with a small portion of the Colville River Special Area, would be designated no lease zones. Docket No. 66, Ex. 10 at 3–5. the Special Areas would preclude petroleum production in 35% of the NWPA, leaving 65% of what its drafters believed would be the high petroleum potential areas open for leasing and development. Id., Ex. 10 at 4.

Plaintiffs argue that the BLM's brief discussion of this alternative fails to satisfy

NEPA. *Id.* at 15–16. Plaintiffs argue that the BLM's justifications, such as statements that the Preferred Alternative "accomplishes a reasonable level of protection ... through judicial use of Special Area designations, a leasing deferral, setbacks and seasonal restrictions, and required, species-specific studies," and that the Audubon Alternative was "overly restrictive," are inadequate. *Id.* at 19; *see also* IAP/EIS Vol. 1 at II–26. Plaintiffs argue these explanations are only reasons to reject the approach, but do not address whether or not the alternative is viable. Docket No. 66 at 19. Plaintiffs assert that Defendants must discuss their reasoning to not consider the alternative, not why the BLM would ultimately reject the alternative. *Id.* at 20

Defendants respond that the Audubon Alternative was only a partial alternative with suggestions ultimately discussed in the five considered alternatives. Docket No. 68 at 33–34. For example, the Preferred Alternative contained Special Area designations, leasing deferral, no permanent surface occupancy restrictions in certain areas, and seasonal restrictions. *Id.;* IAP/EIS Vol. 1 at II–26. The BLM also argued that the Audubon Alternative violated the NPRPA by putting 35% of NWPA off-limits to petroleum production. Docket No. 68 at 34. Defendants argue that the NPR–A was created for petroleum leasing and that the BLM is not required to consider contrary alternatives. *Id.*

Plaintiffs are quibbling over semantics. There is not a meaningful distinction between evaluating reasons pro and con for selecting an alternative, and evaluating reasons pro and con for rejecting an alternative. Inconsistency with the overall project is a basis for not considering an alternative. The EIS must be considered as a whole. NEPA requires the BLM to briefly explain its reasoning for eliminating an alternative. *See* 40 C.F.R. § 1502.14(a)

("for alternatives which were eliminated from detailed study, [agencies shall] briefly discuss the reasons for their having been eliminated."). An EIS does not need to discuss every conceivable alternative, especially when the alternative is not significantly distinguishable from another alternative. *See Westlands Water Dist. v. United States Dep't of Interior,* 376 F.3d 853, 871 (9th Cir.2004); *Headwaters, Inc.,* 914 F.2d at 1181. After reviewing the explanation offered in the EIS by the BLM justifying not considering the Audubon Alternative, it appears that the explanation is adequate. The BLM explained its view that the Preferred Alternative contained similar information and protections as those suggested in the Audubon Alternative. Docket No. 68 at 33; *see also* IAP/EIS Vol. 2 at VII–85, VII–88, VII–135. Further, Plaintiffs concede that the Audubon Alternative is not a full alternative by itself, but rather evidences the viability of a more balanced alternative. Docket No. 71 at 10. Therefore, the BLM's explanation for rejecting the alternative was sufficient. More importantly, the consideration the BLM gave to the Audubon Alternative serves to undercut the Plaintiff's argument that suitable "middle ground" alternatives were not discussed. They were discussed and rejected.

## B. Site Specific Analysis

■ Plaintiffs point out that the Ninth Circuit has drawn a distinction between a programmatic EIS and a site specific EIS and argue that the BLM failed to provide a sufficiently site-specific analysis to permit the leasing authorized by the ROD. Docket No. 66 at 20–30. Plaintiffs assert that the Ninth Circuit has clearly determined that issuing oil and gas leases allowing surface occupancy is an irretrievable commitment of resources requiring a full EIS analysis. Docket No. 66 at 20

(citing *Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1227 (9th Cir.1988)); *see also Conner v. Burford,* 848 F.2d 1441, 1450 (9th Cir.1988). The EIS for an irretrievable commitment of resources must include a site-specific analysis. *Id.* (citing *Block,* 690 F.2d at 761 (9th Cir.1982)). Plaintiffs argue that despite the fact that the leases issued in the NWPA are an irretrievable commitment of resources requiring a detailed EIS, the BLM only provided a programmatic EIS. *Id.* at 22. Plaintiffs explain that agencies often make a decision in two stages—a programmatic EIS for planning decisions and site specific analysis with resource commitments. They further note that the BLM made both decisions with the IAP/EIS, but failed to provide the required site specific analysis. *Id.* at 24; *see also* Docket No. 66, Ex. 19 at 1 (discussing the "[t]wo levels of consideration here: Land Use Plan decisions AND Implementation Decisions"). Plaintiffs assert that it is insufficient that the BLM conducts or plans to conduct a site specific analysis at a later date, because "the promise of site-specific EIS's [sic] in the future is meaningless if later analysis cannot consider wilderness preservation as an alternative to development." *Block,* 690 F.2d at 763. Supporting Plaintiffs' argument, the IAP/EIS states that:

> [t]he analysis in this [IAP/EIS] is intended to support a programmatic-level planning decision .... It is appropriate that the analysis in the IAP/EIS is broad in scope because the decisions on the leasing program and mitigation measures will be broad in scope. The site-specific NEPA analyses for proposed exploration and development activities would be prepared at the time that these actions are ripe for decision.

IAP/EIS Vol. 2 at VII–323 (response to comment 249–518). Plaintiffs further argue that statements that the BLM will "be able to protect [subsistence] cabins and camps from oil and gas activities at the site-specific authorization stage," IAP/EIS Vol. 1 at II–7, and that "careful sitting of facilities after site-specific environmental analysis is expected to result in avoidance and protection of rare plant species," IAP/ EIS Vol. 2 at V–56, evince the BLM's failure to create the required site specific EIS.

Defendants respond that a site-specific analysis, specifically a tract by tract analysis, would be impracticable and result in a speculative analysis. Docket No. 68 at 10. Defendants argue that the BLM's analysis on a resource by resource basis satisfied the site specific requirement. *Id.* Defendants explain that the nature of petroleum development is highly speculative because past experience leasing on the North Slope leads it to conclude that only 4,000 of the 6 to 8 million acres expected to be offered in lease sales will ever be physically altered by development. *Id.* at 11; IAP/EIS Vol. 3 app. 2–7–2–9 (summarizing impacts of multiple lease sale on vegetation). Therefore, a tract by tract analysis ignores the reality of development. The BLM determined that the projected leasing and development scenario adequately assessed the potential impacts on the resources and species within the planning area. *Id.* at 14. The BLM also acknowledged that "[a]ll subsequent exploration and development activities will require additional NEPA analysis and permits with special consideration given to site-specific conditions in the area of operations. A major new field development will undoubtably require a NEPA review." IAP/EIS Vol. 2 at VII–323. In sum, Defendants argue that a resource by resource analysis combined with the promise of future NEPA analysis satisfies the site specific requirement.

In *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir.1988), the Ninth Circuit clarified when the "irreversible and irretrievable commitments" of the availability of

resources occurs with respect to petroleum leases. 42 U.S.C. § 4332(C)(v). The Court distinguished leases with "no surface occupancy" ("NSO") restrictions from those with "non-NSO" restrictions. *Conner*, 848 F.2d at 1447. NSO leases simply give the lessee the right of first refusal—not an irretrievable commitment of resources. *Id.* at 1448. Whereas non-NSO leases "do not reserve to the government the absolute right to prevent all surface-disturbing activity," and therefore constitute an irretrievable commitment of resources. *Id.* at 1449, 1451.

Defendants argue, however, that *Conner* is distinguishable because the BLM in that case only prepared an environmental assessment rather than an EIS. Docket No. 68 at 18–19. In this case, Defendants argue that the BLM created an EIS satisfying *Conner*. *Conner* provides the Ninth Circuit's interpretation of whether or not a non-NSO lease constitutes an irretrievable commitment of resources requiring an increased level of attention—the distinction between a programmatic evaluation and a site specific evaluation. First, a preliminary evaluation is conducted to determine whether a proposed project will have significant impact on the environment. If it will, an EIS must be prepared. An EIS assumes significant impacts and thus evaluates them measuring the environmental cost against the estimated project benefit. The Court must determine if the resource specific evaluation the agency performed is the conceptual equivalent of the site-specific evaluations called for in *Conner* where non-NSO leases constitute an irretrievable commitment of resources.

The Ninth Circuit, in *Block* explained that "[t]he critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur."

690 F.2d at 761 (citing *County of Suffolk v. Sec'y of Interior*, 562 F.2d, 1368, 1378 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978)). Site specific impacts must be evaluated at the point of "critical decision" when "the agency proposes to make an 'irreversible and irretrievable commitment of the availability of resources' ...." *Id.* (citing *Sierra Club v. Hathaway*, 579 F.2d 1162, 1168 (9th Cir.1978)). "[T]he promise of site-specific EIS's [sic] in the future is meaningless if later analysis cannot consider wilderness preservation as an alternative to development." *Id.* at 763. *Conner* and *Block* provide that when the BLM issues non-NSO leases, this irretrievable commitment of resources requires the agency to conduct a site specific analysis within the EIS. Therefore, the question remains whether or not the BLM's resource specific evaluation satisfies the requirement of a site-specific evaluation.

Throughout the EIS, the BLM states that a site-specific analysis will occur in the future. *See* IAP/EIS Vol. 1 at II–7; Vol. 2 at V–56, VII–323. Under the *Conner/Block* reasoning, this future analysis may be unsatisfactory because it is "meaningless if later analysis cannot consider wilderness preservation as an alternative to development." *Block*, 690 F.2d at 763. However, *Conner* clarified that due to the uncertain, speculative nature of petroleum exploration, the BLM must "estimate what [the effects of leasing] might be before irrevocably committing to the activity." 848 F.2d at 1450. *Block* also stated that the "detail NEPA requires in an EIS depends upon the nature and scope of the proposed action." 690 F.2d at 761. Therefore, due to the speculative nature of petroleum production, the resource by resource analysis provided by the BLM may have been its only option to satisfy NEPA site specific requirements. Because the BLM determined that a resource by re-

source analysis provided less speculative results than a tract by tract analysis, while assuring that all risks to the environment from the contemplated leasing would be closely considered, the agency could reasonably conclude that it met the site specific requirement. Such a decision is not arbitrary and capricious, and does not violate NEPA. *See Northern Alaska Environmental Center v. Lujan,* 961 F.2d 886, 890–91 (9th Cir.1992) (applying rule of reason); *Friends of Yosemite Valley v. Norton,* 348 F.3d 789, 800 (9th Cir.2003) (same).

## C. Analysis of Mitigating Measures

Plaintiffs argue that the BLM's failure to discuss the effectiveness of stipulations used in the NWPA, which are "radically" different from those used in the Northeast Planning Area, violates NEPA. Docket No. 66 at 31. Instead of the enforceable lease terms used in the Northeast Planning Area, in the NWPA the BLM used "required operating procedures" ("ROPs"). IAP/EIS Vol. 1 at II–14. Plaintiffs assert that the BLM failed to analyze the effectiveness of this approach. They explain that the BLM simply listed mitigation measures without any effectiveness analysis. Docket No. 66 at 32.

Defendants respond that the BLM did analyze and discuss the effectiveness of the mitigation measures and therefore the EIS satisfies NEPA requirements. Docket No. 68 at 36–38. Defendants argue that the mitigation plans are more specific than the "general terms and ... general processes" approved by the Ninth Circuit in *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 477 (9th Cir.2000). Docket No. 68 at 37. Therefore, Defendants state, the IAP/EIS mitigation discussion is adequate.

 "An EIS is not complete unless it contains 'a reasonably complete discussion of possible mitigation measures.'" *Okanogan Highlands,* 236 F.3d at 473 (quoting

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 352, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). The regulations guiding implementation of NEPA require that the environmental consequences section of an EIS shall include a discussion of the "[m]eans to mitigate adverse environmental impacts." 40 C.F.R. § 1502.16(h). "Mitigation must 'be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *Neighbors of Cuddy Mountain v. United States Forest Serv.,* 137 F.3d 1372, 1380 (9th Cir.1998) (quoting *Carmel–By–the–Sea v. United States Dep't of Transp.,* 123 F.3d 1142, 1154 (9th Cir.1997) (quoting *Robertson,* 490 U.S. at 353, 109 S.Ct. 1835.)). The mitigation plan does not need to be in "final form to comply with NEPA's procedural requirements." *Nat'l Parks & Conservation Ass'n v. United States Dep't of Transp.,* 222 F.3d 677, 681 n. 4 (9th Cir.2000). But, "[a] 'mere listing' of mitigating measures, without supporting analytical data, ... is inadequate." *Okanogan Highlands,* 236 F.3d at 473 (quoting *Idaho Sporting Cong.,* 137 F.3d at 1151) (quoting *Northwest Indian Cemetery Protective Assoc. v. Peterson,* 795 F.2d 688, 697 (9th Cir.1986), *rev'd on other grounds,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)).

After reviewing the RODs, the Court concludes that the BLM has offered more than a "mere listing" of the mitigating measures and has satisfied NEPA's requirements. *See generally* IAP/EIS Vol. 3 app. 12. While it is true that the BLM did not rank the effectiveness of the mitigation measures as the Forest Service did in *Okanogan Highlands,* 236 F.3d at 474, this Court is nonetheless convinced that the BLM did "ensure that the environmental consequences [were] fairly evaluated." *See Carmel–by–the–Sea v. United States Dep't of Transp.,* 123 F.3d 1142, 1154 (9th Cir.1997) (quoting *Robertson,* 490 U.S. at

353, 109 S.Ct. 1835). Therefore, Defendants mitigation measures in the IAP/EIS are not arbitrary and capricious.

### D. Cumulative Impacts of Reasonably Foreseeable Actions

■ Finally, Plaintiffs argue that Defendants failed to address the cumulative impact of a reasonably foreseeable action. Docket No. 66 at 35. Plaintiffs argue that an existing proposal to amend the Northeast Integrated Activity Plan/Environmental Impact Statement ("Northeast IAP/EIS") covering adjacent areas by removing specified wildlife protections is a foreseeable future action that the BLM must consider in the NWPA EIS. *Id.* at 37. Plaintiffs assert that the BLM announced its plans to revise the Northeast IAP/EIS in the Notice of Intent to Amend the Northeast National Petroleum Reserve–Alaska Integrated Activity Plan and to Prepare an Accompanying Environmental Impact Statement, Request for Information, and Call for Nominations and Comments ("Notice of Intent") six months prior to issuance of the NWPA IAP/EIS. *Id.* at 38. Because "NEPA requires consideration of the potential impact of an action before the action takes place," *Tenakee Springs v. Clough,* 915 F.2d 1308, 1313 (9th Cir.1990), Plaintiffs argue that the BLM needs to analyze the cumulative effects of the proposed revision prior to the actual revision. Docket No. 66 at 39; *see also Thomas v. Peterson,* 753 F.2d 754, 760 (9th Cir.1985) ("[t]hat purpose requires that the NEPA process be integrated with agency planning 'at the earliest possible time,' 40 C.F.R. § 1501.2, and the purpose cannot be fully served if consideration of the cumulative effects of successive, interdependent steps is delayed until the first step has already been taken."). Plaintiffs specifically argue that it was unreasonable for the BLM to not discuss the cumulative impacts of opening the Teshekpuk Lake Area in the Northeast planning area to leasing. Docket No. 66 at 39. This reopening may have a cumulative impact in the NWPA on the Teshekpuk Lake Caribou Herd. *Id.; see also* Docket No. 66, Ex. 21 at 2–3. Plaintiffs further assert that the BLM even acknowledged that because of the protections in the Northeast planning area, the cumulative impacts in the NWPA were insignificant. Docket No. 66 at 40; IAP/EIS Vol. 2 at VII–198.

Defendants respond that the proposed changes to the Northeast IAP/EIS are too speculative to complete an adequate cumulative impacts analysis. Defendants further argue that NEPA only requires a cumulative impacts analysis when it is a proposed action. Docket No. 68 at 23; *see Lands Council v. Powell,* 379 F.3d 738, 746 (9th Cir.2004) ("precedent defines 'reasonably foreseeable' in this context to include only 'proposed actions' "). The CEQ regulations define a "proposal" with two prongs: (1) the agency is actively pursuing a goal, and (2) the effects can be meaningfully evaluated. *See* 40 C.F.R. § 1508.23. The Notice of Intent discussed here, Defendants argue, is too speculative to meaningfully evaluate any effects and was merely a press release and scoping notice. Docket No. 68 at 23. Therefore, the BLM was not required to consider the cumulative impacts of the proposed Northeast IAP/EIS amendment.

Resolution of this issue centers around whether or not the Notice of Intent was a proposed action requiring a cumulative effects analysis in the NWPA EIS. A " '[c]umulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. The Ninth Circuit has previously explained that a Notice of In-

tent means that the agency action is "reasonably foreseeable" for purposes of a cumulative effects analysis in the EIS. *See Tenakee Springs*, 915 F.2d at 1313; *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 812 (9th Cir.1999). In *Muckleshoot* the Ninth Circuit explained that the agency action was "not too speculative" when the Forest Service had only issued a press release. 177 F.3d at 812. Further, as Plaintiffs point out, the Notice of Intent in *Muckleshoot* was issued five months after preparation of the EIS in question. Docket No. 71 at 32; *see Muckleshoot*, 177 F.3d at 812 (EIS issued November 1996); 62 Fed.Reg. 22906 (Notice of Intent issued April 28, 1997).

Defendants argue that it is not the stage in the NEPA process that is important, but the definitiveness of the proposed action. Docket No. 68 at 21–27. Defendants explain that the proposed amendment to the Northeast IAP/EIS is too speculative to be a reasonably foreseeable action. *Id.* at 26. This argument is unpersuasive. Consistent with Ninth Circuit precedent, the Notice of Intent to amend the Northeast IAP/EIS satisfies the "reasonably foreseeable" requirement for a cumulative effects analysis. Moreover, the fact that the BLM planned far enough ahead to issue a schedule for the NEPA process provided within the Notice of Intent evidences the foreseeability of the amendment. *See* 68 Fed.Reg. 37173. The BLM admitted in the EIS that the protections within the Northeast planning area created insignificant cumulative impacts. An amendment to the Northeast IAP/EIS would surely alter this conclusion, and therefore the BLM must analyze these effects to satisfy NEPA's "hard look" requirement at some stage. The issue is therefore one of timing. Essentially, the agency has in effect given notice that it will consider all impacts cumulative and site specific in any modification to the EIS

in the Northeast planning area. It would appear that reliance on protections contained in the existing Northeast planning area EIS to find minimal impacts in the NWPA would burden the agency to reconsider this issue in any supplemental EIS in the North East Planning Area that would affect the NWPA. *See, e.g., Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1357–58 (9th Cir.1994) ("having persuaded the district court that it understands its duty to follow NEPA in reviewing future site-specific programs, judicial estoppel will preclude the service from later arguing that it has no further duty to consider the cumulative impact of site specific programs.") (citations omitted).

Thus the issue boils down to this—while the agency must consider all cumulative impacts before altering the EIS for the Northeast Planning Area, must it nevertheless delay issuing an EIS for the NWPA until all comments are in and a meaningful evaluation of the decision to modify the NEPA EIS can be made? In other words must both EISs issue together. Since the NEPA EIS cannot be modified to change any aspect of the NWPA EIS that depends upon it, the requisite cumulative impact study may await issuance of the NEPA EIS. Of course that document, and any action based upon it, i.e. relaxation of environmental protections that impact the NWPA, would be defective and thus unenforceable to the extent that cumulative impacts were not adequately considered. The BLM did not have to delay issuing an EIS for the NWPA until the NEPA EIS issued.

## II. ESA Violations

Plaintiffs allege that the FWS and the BLM failed to satisfy the ESA because the BiOp (1) fails to assess the entire agency action, and (2) ignores the uneven distribu-

tion of Steller's eiders and spectacled eiders. Docket No. 66 at 40–50.

## A. Agency Action Assessment

■ Plaintiffs first argue that the BiOp is inadequate because the FWS relied on hypothetical scenario in BiOp creation and BLM relied on future consultations in its analysis. *Id.* at 42–47. Plaintiffs assert that the FWS must "look at all possible ramifications" of the agency action in the BiOp. *Id.* at 42 (citing *Conner,* 848 F.2d at 1453) (quoting *North Slope Borough v. Andrus,* 642 F.2d 589, 608 (D.C.Cir.1980)). The ESA "requires that the consulting agency scrutinize the total scope of agency action." *Andrus,* 486 F.Supp. at 353. Uncertainty requires FWS to "make projections, based on potential locations and levels [of] oil and gas activity, of the impact of production of protected species." *Conner,* 848 F.2d at 1454.

■ First, Plaintiffs argue that Defendants failed to meet this standard because the "hypothetical scenario" only assumed development would occur in a relatively discrete area of high petroleum potential areas despite the fact that the BLM's decision opens the whole NWPA. Docket No. 66 at 43. The scenario further assumes that only eight fields will be developed. *See* IAP/EIS Record of Decision at C–68 ("ROD"). Although the ROD does not require roadless development, the FWS scenario assumes that development will be roadless. Docket No. 66 at 43; *see* ROD at C–69 (describing assumptions used in developing the Biological Assessment: "All development facilities are considered to be 'roadless.' "); IAP/EIS Vol. 1 at IV–72 (discussing possibility of permanent roads). The ROD also requires "to the extend [sic] practical" that utility wires be installed on pipelines or buried, ROD at B–9, but the FWS scenario assumes that this will always happen to limit eider collisions, ROD at C–70. Docket No. 66 at 43. Thus, Plaintiffs assert that the relied upon scenario is inadequate.

Second, Plaintiffs argue that the agencies failed to satisfy ESA requirements by relying on future consultations. *Id.* at 45–46. Plaintiffs assert that the Ninth Circuit clearly rejected this approach in *Conner* explaining that the agency was not excused from its obligation even "if, in [the agency's] judgment, there is insufficient information to complete a comprehensive opinion and it takes upon itself incremental-step consultation ...." 848 F.2d at 1455. Third, Plaintiffs argue that FWS could have advised the BLM of the jeopardy potential and the BLM could have then altered the alternatives to accommodate this potential. Docket No. 66 at 46–47.

Defendants respond that the BLM and FWS developed a "reasonable and foreseeable development scenario." Defendants further argue that this scenario was based on the best available scientific data within Ninth Circuit precedent. Docket No. 68 at 45. The BLM further concedes that if future actions differed from the BiOp assumptions the BLM would reinitiate consultation with the FWS. *Id.* at 46; *see also* 50 C.F.R. § 402.16(b) (requiring reinitiating of formal consultation "if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered[, or] if the identified action is subsequently modified in a manner that causes an effect to listed species or critical habitat that was not considered in the biological opinion ...").

The hypothetical scenario presented by FWS in the BiOp is precisely the projection envisioned by the Ninth Circuit in *Conner. See* 848 F.2d at 1454 (citing *Roosevelt Campobello Int'l Park Comm'n v. EPA,* 684 F.2d 1041, 1052–55 (1st Cir. 1982)). FWS looked to the reasonably foreseeable activities projected by the

BLM for the BiOp analysis. *See* ROD at C–10. To compensate for the uncertainty, FWS also relied on the assumption that "this model reasonably predict[s] the maximum amount of development and maximum resulting impact to eiders." *Id.* Therefore, given the uncertainty behind petroleum development, the Court concludes that the BiOp adequately predicted the potential impacts to the eiders.

■ The stipulations used in the leases also are permissible under the ESA. In *Conner*, the leases included a stipulation requiring consultation with the "Federal surface management agency" prior to any surface disturbing activities. 848 F.2d at 1455. The Ninth Circuit explained that such a provision violated the ESA's "clear mandate that a comprehensive biological opinion . . . be completed before initiation of the agency action." *Id.* The agencies in this case did complete the BiOp prior to initiating the agency action. The stipulations in this case differ significantly from those in *Conner*. Here, the stipulations do not require federal action unless the lessee discovers spectacled eiders and/or Steller's eiders in its proposed development area. *See* ROD at B–9 (discussing ROP E–11); IAP/EIS Vol. 3 app. 12 at B–16 (same). This provision complies with the regulations guiding implementation of the ESA, 50 C.F.R. § 402.16(b), rather than effectively amending the ESA as was the concern in *Conner*, 848 F.2d at 1455. Therefore, FWS and the BLM did not rely on future consultations violating the ESA. Because this Court has determined that the scenario used in the BiOp was reasonable and the agencies did not rely on impermissible future consultations, analysis of Plaintiffs third argument is unnecessary. The BiOp is valid under the ESA.

**B. Uneven Distribution of Eiders**

■ Plaintiffs finally argue that the BiOp is fundamentally flawed because it ignores the fact that eiders are unevenly distributed. Docket No. 66 at 47–50. Plaintiffs conclude that FWS's assumption that eiders are evenly distributed fails to use the "best scientific . . . data available" and consider all relevant factors violating the ESA. *See Conner*, 848 F.2d at 1453. Plaintiffs explain that FWS calculated the average density of eiders, determining that eiders had a very low density. Docket No. 66 at 49. Therefore, this determination allowed FWS to conclude that the actions of the BLM presented a low threat to the eiders. Plaintiffs argue that FWS ignored known areas of eider concentration, and therefore reliance on the BiOp is arbitrary and capricious. Docket No. 66 at 48–50; ROD at C–16 ("[i]n some years, up to several dozen pairs may breed in a few square kilometers."); Docket No. 66, Ex. 5 at 43 ("[n]ests are clumped in good habitat.").

Defendants respond that FWS in fact used the highest density projections to compensate for uncertainties. Docket No. 68 at 48–49; ROD at C–25. Further, Defendants argue that Plaintiffs ignore the lease provision that ensures that leasing activities mitigate the impact on eiders regardless of density. Docket No. 68 at 48; *see* ROP at E–11; ROD at C–31.

The Court finds no blatant errors in FWS's methodology. Further, there is a " rational relationship" between the data analyzed and the situation to which it was applied. *See Envtl. Def. Ctr. v. United States Envtl. Prot. Agency*, 344 F.3d 832, 872 (9th Cir.2003). "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving engineering and scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir.1989). FWS's eider density determination falls within this expertise. The

density determination of FWS was not "arbitrary and capricious."

## CONCLUSION

The Court determines that Defendant's actions were not arbitrary and capricious because the IAP/EIS considered a reasonable range of alternatives and gave sufficient consideration to reasonably foreseeable alternatives in its cumulative impacts analysis. Further, the Court finds that the BiOp reasonably discussed the entire agency action as contemplated by the ROD and accurately and sufficiently accounted for the distribution of eiders.

For the foregoing reasons, the Court **DENIES** Plaintiffs' request for declaratory judgment with regard to the IAP/EIS at **Docket No. 66**. The Court also DENIES Plaintiffs' request for declaratory judgment with regard to the BiOp at **Docket No. 66**.

**IT IS SO ORDERED.**